UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARLO VARTINELLI,

        Plaintiff,                CIVIL NO: 07-12388

                                          DISTRICT JUDGE MARIANNE O. BATTANI
                                          MAGISTRATE JUDGE STEVEN D. PEPE

vs.

RICHARD STAPLETON, M HALL, SHERRY BURT,
GREG HISSONG, STEWART, A FAGHIHNIA, R MONROE, J RICCI,
BETTY GLASPER, RON GREEN, ELLISWORTH, S CAMPBELL,
CAROL VALLIE, C HUTCHINSON,

        Defendants.
_____/

**REPORT AND RECOMMENDATION ON DEFENDANT ARDESHIR FAGHIHNIA. M.D.'S MOTION FOR SUMMARY JUDGEMENT (DKT. #89)**

        This is a *pro se* prisoner lawsuit under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment and Americans with Disabilities Act ("ADA"). At the time of the incidents involved in the case, Plaintiff was incarcerated in Jackson, Michigan, at the Southern Michigan Correctional Facility ("JFM") of the Michigan Department of Corrections ("MDOC"). Plaintiff alleges that, while incarcerated at JFM, Defendants violated his Eighth Amendment rights by not providing him a special diet needed because of his allergies to fish, fish odor, milk and peanut butter. Plaintiff seeks in excess of $100,000 in compensatory and punitive damages among other claims for relief (Complaint, p. 19, 20).

        On January 27, 2009, Defendants Correctional Medical Services, Inc. ("CMS"), Craig Hutchinson, M.D., and Ardeshir Faghihnia, M.D., moved for summary judgment (Dkt. #89).

1

Defendants CMS and Dr. Hutchinson have already been dismissed as Defendants in this action (Dkt. #81 & #103). Therefore, this Report and Recommendation only addresses Defendant Faghihnia. All pre-trial matters were referred under 28 U.S.C. § 636(b) (Dkt. #27). For the reasons stated below, it is **RECOMMENDED** that Defendant Faghihnia's motion for summary judgment be **GRANTED.**

I. **BACKGROUND**

Plaintiff alleges that he is allergic to fish, fish odors, milk and peanut butter. He claims that his Eighth Amendment rights have been violated when medical staff at JFM did not prescribe him a fish-free diet and instead served him milk and peanut butter. He has no formal medical record indicating these allergies and declined allergy testing offered by Defendant CMS (Dkt. #34, Release of Responsibility, Ex. A). Plaintiff filed several grievances related to his alleged allergies and his treatment by food services and medical services.

There are three references in the record to a medical detail indicating Plaintiff's alleged allergies and special diet:

> 1.) A May 19, 2003, Special Accommodation Notice prescribing a Therapeutic Diet accommodation of "vegetarian tray when fish is served" (Complaint, Ex. 2, p. 1).
>
> 2.) A February 25, 2004, Medical Detail instructing a "vegetarian tray when fish, dairy products, peanuts, peanut butter served" (Complaint, Ex. 2, p. 2).
>
> 3.) A December 13, 2004, Defendant Greg Hissong response to Grievance No. JMF-2004-12-2542-09d, in which he notes that Defendant Valerie Hammond, R.N., from JMF Health Care stated on December 10, 2004, that Plaintiff "does not have a prescribed medical diet detail but a medical detail stating 'fish free meals, meal to unit when fish is served'" (Complaint, Ex. 4, p. 2).

The Hissong response noted also that Hammond stated that "Food Service does not have a specific prescribed diet detail" for the Plaintiff and that Plaintiff was "not allergic to cheese or

2

peanut butter per the medical chart" (*id.*).  Plaintiff had complained about receiving "cold bagged-bologna sandwiches" and asserted he had a vegetarian diet (*id.* at 4-5).  Defendant Hissong's response notes that Ms. Hammond saw no issue with Plaintiff being provided a bagged meal when fish was served to the other inmates (*id.* at 2).  Yet Plaintiff's Exhibit #2, in item 2.) above is a *vegetarian* tray medical detail "when fish, dairy products, peanuts, peanut butter served."

Defendants are various staff members of JMF, MDOC staff, and CMS personnel.  Because JMF has closed, the Defendants that worked there have been moved to various positions at different MDOC facilities.  Plaintiff indicates in his Complaint that Defendant Ardeshir Faghihnia, M.D., was, at all times relevant, "JMF's 'Medical Service Provider' (MSP) in charge of ensuring the delivery of Plaintiff's medical needs" (Complaint, p. 4, ¶ 12).  In the present motion, Defendant Faghihnia states that he was an independent contractor of CMS working at JMF (Dkt. #89, p. 2).

Plaintiff has filed several grievances, but only nine have been pursued to Step III (Dkt. #34, Grievance Inquiry Screen, Ex. C).  Plaintiff has also attached two other grievances, JMF-04-11-24-09d and JMF-05-04-631-09z, which were not pursued to Step III.  Grievance No. JMF-04-11-24-09d, filed November 30, 2004, alleges Food Service's indifference towards accommodating his special dietary needs (Complaint, Ex. 3).  Grievance No. JMF-05-04-631-09z, filed on April 12, 2005, claims that Plaintiff is going hungry because food services refused

to grant him his alleged medically prescribed diet (Complaint, Ex. 10).  Because Plaintiff did not pursue these two grievances to Step III he has failed to exhaust these claims.[1]

On December 7, 2004, Plaintiff filed Grievance No. JMF-2004-12-2542-09d, against Food Service alleging they acted with deliberate indifference and interfered with his prescribed diet (Complaint, Ex. 4, p. 1).  This grievance also names Jacobs, Slater, Daymon, "nurse," and Stewart.  Plaintiff complained about an allergic reaction to food served to him – cheese and peanut butter – and that he had only been served five bagged lunches from October 24, 2004, through the date of the grievance.  The Step I grievance response noted there was no prescribed medical diet on file for the Plaintiff, only a detail noting, "fish free meals, meal to unit when fish is served" (*id.* at 2).

On December 9, 2004, Plaintiff filed Grievance No. JMF-2004-12-2603-12d4, against Dr. Faghihnia after the physician cancelled special diet details because he found no indication Plaintiff was actually allergic to fish, peanut butter, milk or wool (Complaint, Ex. 5, p. 1).  The Step I response indicated that Dr. Faghihnia cancelled any special diet related to milk and peanut butter, but left the accommodation for a non-wool blanket because he found a recommendation for it in Plaintiff's file (*id.* at 2).  Plaintiff also alleges the doctor cancelled his necessary medications as well (Complaint, p. 11, ¶ 40).  The Step III grievance response indicates the Plaintiff's medical conclusions were based on medical evaluations and that a disagreement with the medical judgment does not equate a denial of care (Complaint, Ex. 5, p. 8).

---

[1] The Supreme Court notes that a prisoner must follow the state corrections system's procedures and *properly* exhaust all administrative remedies before he may bring a cause of action in federal court.  *Woodford v. Ngo*, 126 S. Ct. 2378 (2006).

On December 10, 2004, Plaintiff filed Grievance No. JMF-2004-12-2573-11e, against Greg Hissong, the Food Service Director, for not meeting Plaintiff's dietary needs and for recommending he see medical staff to discuss a special diet (Complaint, Ex. 6, pgs. 1-2). Plaintiff also complains that Hissong saw his medical file without consent. The grievance also names Dr. Faghihnia and "dieticians" (*id.*). The Step I grievance response states Plaintiff's grievance was denied, indicating that policy was followed, which allows for the Health Care Department to discuss pertinent medical information regarding dietary needs with the Food Service Director, and that Plaintiff had not shown any evidence that he actually had food allergies (Complaint, Ex. 6, p. 4).

On March 1, 2005, Plaintiff filed Grievance No. JMF-2005-03-373-12d4, indicating that he had a lawsuit pending against Dr. Faghihnia and would like someone else to handle his health care (Complaint, Ex. 8, p. 1). Dr. Faghihnia had issued an order to transfer Plaintiff to a housing unit without a microwave to placate Plaintiff who claimed he was allergic to the smell of fish, which gets cooked in housing unit microwaves (*id.*). Plaintiff complained that the only such unit was in a higher security level. Plaintiff was granted his request for a change of treaters and was reassigned to the care of the physician assistant (*id.* at 2).

On April 4, 2005, Plaintiff filed Grievance No. JMF-2005-04-571-09z, alleging he was not served lunch in his unit on March 30, 2005, and that his spaghetti served later that day was contaminated with fish and caused an allergic reaction (Complaint, Ex. 9, p. 1). The grievance names Potter, Jeff, and "warden," but does not relate the grievance against any specific person. The Step I response indicates that the Plaintiff's lunch was delivered and no fish was cooked for

5

dinner that day (*id.* at 2). It also states that there was no evidence Food Service was contaminating Plaintiff's meals prior to it leaving Food Service (*id.*).

On April 4, 2005, Plaintiff filed Grievance No. JMF-2005-04-585-17z, complaining that food was not being delivered to his unit. Plaintiff refused to go to the chow hall for fear there would be fish present (Complaint, Ex. 7C). Plaintiff also contends he received no meal on March 30, 2005 (*id.*). The grievance names Johnston, Ellisworth, Potter, Faghihnia, Stuart, "warden," and Thompson. The Step I response states that investigation revealed the meals were taken to Plaintiff but he refused them (*id.* at 2).

On April 28, 2005, Plaintiff filed Grievance No. JMF-2005-04-737-12d2, in which he complains that he kited healthcare regarding back pain on April 19, 2005, but did not receive an appointment until April 26 (Complaint, Ex. 12, p. 1). Moreover, Plaintiff states he was diagnosed with shingles and blames the prison for the exposure (*id.* at 1-3). This grievance names Peckham, Health Services, 'nurse,' Patino, Burt, Long, Gregurek and Faghihnia. The Step I and Step II responses explained the delay but the Step III response agreed with Plaintiff that the delay should not have occurred (*id.* at 7).

On April 13, 2005, Plaintiff filed Grievance No. JMF-2005-04-644-17a, complaining that he received a bagged lunch containing dairy products and a cold-bagged lunch for dinner (Complaint, Ex. 11, p. 1). The grievance specifically names CO Anderson for determining what Plaintiff can medically eat and drink. The grievance also names Slator, Stuart and Hissong. The Step I response indicated that Food Service was preparing the Plaintiff's meals and that the Plaintiff's allegations regarding conversations that he had were false (*id.* at 2).

On May 18, 2005, Plaintiff filed Grievance No. JMF-2005-05-860-03d, addressing several issues. He first complains that he suffered an allergic reaction while in segregation for his refusal to move to a new cell. Dr. Faghihnia had ordered the move to a new cell without a microwave because the Plaintiff complained that microwaved fish could kill him (Complaint, Ex. 13, p. 1). Defendants Faghihnia and Hall are named in the grievance; the former for issuing the medical detail and the latter for attempting to move the Plaintiff. Long and Jeff are also named. The Step I response indicated the staff was following the medical detail in moving the Plaintiff and no harm would have resulted in the move (Complaint, Ex. 13, p. 1). Plaintiff was issued a major misconduct ticket for refusing to pack up his property and move cells when ordered to do so (Complaint, Ex. 14, 14A, 14B).

## II.    ANALYSIS

### A.    The Legal Standards

1. Summary Judgment Standards

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711

F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### 2. Exhaustion Requirements

Under the Prisoner Litigation Reform Act ("PLRA"), a prison inmate cannot maintain a civil rights action challenging prison conditions if he did not first exhaust "such administrative remedies as are available." Defendant Faghihnia does not dispute that Plaintiff has properly exhausted his administrative remedies as to him. Rather, Defendant Faghihnia argues that he should be granted summary judgment because (1) Plaintiff failed to produce sufficient evidence to establish that he is a "public entity" as defined by Title II of the ADA, and (2) because Plaintiff failed to produce sufficient evidence to establish the subjective element of his deliberate indifference claim.

### B.  **Factual Analysis**

1. Plaintiff's Americans With Disabilities Act Claim

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., states that "no qualified individual with a disability, shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12131. Under Title II, a "public entity" is defined as follows:

> (A) any State or local government;
>
> (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
>
> (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of Title 45).

42 U.S.C. §12131(1). Therefore, only "public entities" as defined in 42 U.S.C. § 12131(1) may be held liable under Title II of the ADA.

In the present case, Plaintiff has failed to put forth sufficient evidence to demonstrate that Dr. Faghihnia is a "public entity" as defined by Title II of the ADA and, in fact, cannot do so. Dr. Faghihnia is an independent contractor of CMS, which is a private corporation under contract with the State of Michigan to provide certain health care services to inmates incarcerated by the MDOC. Dr. Faghihnia is not a State or local government, a subdivision of same, or a commuter authority. Thus, Dr. Faghihnia is clearly not a "public entity." Furthermore, Plaintiff cannot put

forth any affirmative evidence that Dr. Faghihnia is a "public entity." Therefore, there is no genuine issue of material fact with respect to Plaintiff's ADA claim, and Dr. Faghihnia is entitled to summary judgment as to this claim.

      2. Plaintiff's Claim of Deliberate Indifference

The two essential elements for a claim under 42 U.S.C. § 1983 are: (1) deprivation or violation of a federally protected right, privilege, or immunity, and (2) the fact that the action of the defendant in violating the federal protected right was taken under color of state law. *Gomez v. Toledo*, 446 U.S. 635 (1980); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992). The Eighth Amendment guarantee to be free from cruel and unusual punishment encompasses a prisoner's right to medical care for serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97 (1976). Yet, the Eighth Amendment prohibits mistreatment only where it equates to "punishment," and, therefore, the courts have imposed liability upon prison officials, including health care providers, only where their actions are so deliberately indifferent to the serious medical needs of a prisoner that they constitute unnecessary and wanton infliction of pain. *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006).

Therefore, in order to state a § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). To succeed on such a claim, a prisoner must satisfy two elements, an objective one and a subjective one. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). In other words, the prisoner must show that he had a serious medical need, and he must show that the defendant, being aware of that need, acted with deliberate indifference to it. *Wilson*, 501 U.S. at 300.

To satisfy the subjective component, a prisoner must show that "an official who **actually knew** of the serious medical need possessed a sufficiently culpable state of mind." *Perez*, 466 F.3d at 424 (emphasis added). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *see also Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) (finding that "deliberate indifference" is more than mere negligence and less than actual intent). Even "gross negligence" by prison officials is insufficient to support a deliberate indifference claim. *McGhee v. Foltz*, 852 F.2d 876, 881 (6th Cir. 1988). A prison official's subjective state of mind must manifest "deliberateness tantamount to intent to punish." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Thus, the Supreme Court has explained that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Thus, it is well settled that courts do not typically intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Therefore, a mere disagreement with medical judgment is insufficient to establish deliberate indifference. *See Estelle*, 429 U.S. at 105-107.

Dr. Faghihnia argues that Plaintiff is unable to satisfy the subjective component of his deliberate indifference claim against him. He contends that there is no evidence that he subjectively knew and believed that Plaintiff was faced with a serious medical need and then

11

consciously disregarded that need with deliberateness tantamount to intent to punish. Instead, Dr. Faghihnia avers that the undisputed facts demonstrate that Dr. Faghihnia was not deliberately indifferent to Plaintiff's medical needs, but at all times provided him with reasonable medical care in line with his best medical judgment and the applicable standard of practice and care.

The only allegations stated against Dr. Faghihnia in Plaintiff's Complaint are that he was deliberately indifferent to Plaintiff's medical needs when he 1) allegedly had Plaintiff transferred to a higher security level housing unit without Plaintiff's consent, which Plaintiff argues was a medical decision made without Plaintiff's consent, and 2) allegedly exposed Plaintiff to shingles by housing him in a cell with other inmates with shingles (Dkt #1, ¶¶ 40, 43, 47, 49). Although Plaintiff attached numerous exhibits to his Response, he has put forth absolutely no admissible evidence to support either of his claims against Dr. Faghihnia.

Dr. Faghihnia saw Plaintiff on at least twelve occasions during the eight months that Plaintiff was at his facility (*See* Dkt #89, pp. 1-10). During this period of time, Dr. Faghihnia subjectively perceived that Plaintiff had a popliteal cyst in his right knee, an alleged allergy to fish, and shingles (herpes zoster). Each time that Dr. Faghihnia saw Plaintiff, he provided him with medical care and treatment for whatever medical condition he subjectively perceived was affecting Plaintiff at that time. For example, with respect to Plaintiff's popliteal cyst, Dr. Faghihnia listened to Plaintiff's subjective complaints, objectively examined Plaintiff, assessed Plaintiff with a popliteal cyst in his right knee, took measures to have it removed, and it was eventually surgically removed (*See* Dkt #89, p. 2).

Furthermore, with respect to Plaintiff's alleged fish allergy, Dr. Faghihnia: (1) wrote numerous orders for Plaintiff to receive a fish free diet (Dkt #89, Ex. C, pp. 561, 695, 697,

12

698; Ex. A, p. 61); ( 2) wrote a special accommodation for Plaintiff to be housed in a housing unit without a microwave after Plaintiff complained of being exposed to fish when inmates in his housing unit heated fish in the microwave (Dkt #89, Ex. A, p. 61) ; (3) wrote an order for Plaintiff's microwave free housing unit detail to be canceled after Plaintiff complained of being transferred to a new housing unit without a microwave (Dkt #89, Ex. C, p. 695); (4) spoke to the Warden of the correctional facility to ensure that Plaintiff would be transferred back to a housing unit with a microwave at Plaintiff's request (Dkt #89, Ex. C, pp. 229-236, 567- 568); (5) wrote an order for Plaintiff to have an appointment with the dietician regarding his alleged fish allergy (Dkt #89, Ex. C, p. 695); and (6) wrote an order for the kitchen to provide Plaintiff with a copy of the menu so that Plaintiff could avoid fish on the days it was being served (Dkt #89, Ex. C, p. 695).[2]

Although Plaintiff argues that Dr. Faghihnia made an alleged medical decision (*i.e.*, transferring Plaintiff to a Level IV housing unit) without his consent, Plaintiff has put forth no evidence in support of this claim. Rather, the evidence demonstrates that Plaintiff's claim has no merit. Plaintiff's medical records show that Dr. Faghihnia wrote an order for Plaintiff to be housed in a housing unit without a microwave at Plaintiff's request after he complained of being

---

[2] In regards to an alleged allergy to peanut butter or dairy products, on December 9, 2004, Dr. Faghihnia informed Plaintiff that there was no documentation in his medical file indicating that Plaintiff had an allergy to peanut butter or dairy products (Dkt. #89, Ex. C, p. 561; Ex. D, ¶ 7). At the same time, Dr. Faghihnia also wrote a new accommodation for Plaintiff to receive a bottom bunk detail, fish free meal to his unit when fish is served, at risk for heat related illnesses, extra pillow, no lifting more than 15 lbs., no repetitive pushing or pulling, and an epipen (*id.*). Dr. Faghihnia also instructed Plaintiff to bring any documentation regarding his allergies to him to reconsider the changes he made to Plaintiff's accommodations. He noted that he would add new accommodations if Plaintiff presented any new documentation or developed any problems. He finally noted that Plaintiff should avoid any foods to which he believes he has an allergy.

exposed to fish by other inmates who heated fish in his housing unit microwave (Dkt #89, Ex. A, p. 61). Plaintiff was then transferred by those in charge of custody, not Dr. Faghihnia, to a Level IV housing unit, apparently the only housing unit without a microwave (Dkt #89, Ex. A, p. 57). When Plaintiff realized that his request to be housed in a unit without a microwave meant that he would have to be housed in a higher security level housing unit, he complained (Dkt #89, Ex. A, pp. 58-59) and signed a release of responsibility form cancelling his special accommodation to be housed in a housing unit without microwave access (Dkt #34, Ex. B), despite his alleged allergy to fish. Dr. Faghihnia then met with Plaintiff on two subsequent occasions to discuss Plaintiff's desire to be returned to a housing unit with a microwave despite his previous complaints, spoke with the Warden of the facility regarding Plaintiff's situation, and wrote orders canceling Plaintiff's special accommodation to be housed in a microwave free unit (Dkt #89, Ex. C, pp. 229-236, 567-568). Dr. Faghihnia did not make any medical decisions without Plaintiff's consent, but, rather, treated Plaintiff's subjective complaints and medical needs in a manner that he believed was appropriate in line with his medical judgment.

With respect to Plaintiff's shingles, Dr. Faghihnia provided him with a medical diagnosis and a prescribed course of treatment of Acyclovir and Ultram, and Plaintiff's shingles eventually resolved (*See* Dkt #89, pp. 8-9). Although Plaintiff complains that Dr. Faghihnia intentionally exposed Plaintiff to shingles by housing him in a unit with other inmates infected with shingles, there is absolutely no evidence to support these claims. Rather, the only evidence demonstrates that Plaintiff presented to Dr. Faghihnia with a rash, Dr. Faghihnia assessed Plaintiff's rash as shingles, and prescribed a course of treatment for Plaintiff's shingles that was successful and led to the eventual resolution of Plaintiff's shingles.

In his Response, Plaintiff raises, for the first time, allegations of retaliation against Dr. Faghihnia (*See* Dkt #102). Although Plaintiff's Complaint alleged that other parties retaliated against him, Plaintiff has never previously alleged that Dr. Faghihnia retaliated against him. Therefore, such claims should be disregarded by this Court. Furthermore, even if the Court were to consider such claims, Plaintiff has put forth no evidence to demonstrate which grievances he allegedly filed, no evidence to demonstrate that Dr. Faghihnia took any adverse action against Plaintiff, and no evidence to demonstrate that any action on the part of Dr. Faghihnia was motivated by Plaintiff's alleged protected conduct of filing grievances. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Therefore, even if this Court were to entertain Plaintiff's claims of retaliation, Plaintiff's claims must necessarily fail because there is no evidence upon which a reasonable juror could find that Dr. Faghihnia retaliated against Plaintiff for filing grievances.

The medical evidence presented to this Court demonstrates that there is no genuine issue of material fact with respect to the subjective element of Plaintiff's claims against Dr. Faghihnia, and Plaintiff has not produced any affirmative evidence to the contrary. At best, Plaintiff claims amount to a difference of medical opinion with Dr. Faghihnia, which fails to satisfy Plaintiff's claims of deliberate indifference. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995). Therefore, as there is no affirmative evidence upon which a reasonable juror could find for Plaintiff with respect to his claims against Dr. Faghihnia, summary judgment should be entered in favor of Dr. Faghihnia.

### III.  RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Defendant Faghihnia's motion for summary judgment be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.

Dated: August 3, 2009                          s/ Steven D. Pepe
Ann Arbor, MI                                   United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Report and Recommendation was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 3, 2009.

                s/Deadrea Eldridge
                Generalist Deputy Clerk